John H. TYNER, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee.

No. 18A02–8603–CR–94.

Court of Appeals of Indiana,
Second District.

Feb. 5, 1987.

J.A. Cummins, Public Defender for Delaware Co., Muncie, for appellant.

Linley E. Pearson, Atty. Gen., Theodore E. Hansen, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge.

John Tyner was convicted of causing serious bodily injury while driving when intoxicated, a class D felony,[1] and causing death while driving when intoxicated, a class C felony.[2] Tyner was sentenced to terms of two and five years respectively, the terms running concurrently. Tyner's appeals challenges the admissibility of his blood alcohol test results.

We affirm.

At 6:52 P.M. on September 22, 1984, John Tyner's van passed through an intersection red light. Tyner's van collided with Paul Stuffel's car. Stuffel was severely injured and his wife, Opal, a passenger, died approximately three months later as a result of her injuries. Tyner was taken to the hospital and released.

An emergency medical technician at the accident scene observed beer cans on the van floor. An investigating officer noticed an alcohol odor in the van and saw an open container of beer, which had spilled. Another officer spoke with Tyner and noted that his eyes were bloodshot, his speech slurred, and he smelled of alcohol.

At the hospital, Tyner was offered a urinalysis test for blood alcohol content. He consented initially, but chose to throw the sample into the toilet rather than allow the test to proceed. After the hospital release, Tyner was taken to the Delaware County Jail, where he was given a breathalyzer test. At 10:20 P.M. that evening, roughly three and one-half hours after the accident, Tyner's blood alcohol content was 0.13%.

Tyner was charged in two counts. The statutes, I.C. 9–11–2–4 and 9–11–2–5 (Burns Code Ed.Supp.1986), provide increased penalties when driving while intoxicated, or driving with a blood alcohol content of 0.10%, cause either serious bodily injury or death. The first count charged Tyner with the death of Opal Stuffel, a class C felony. The second count charged a class D felony for the injuries sustained by Paul Stuffel. Both counts charged Tyner with "operat[ing] a motor vehicle *while intoxicated....*" (Record at 46, 47; emphasis supplied.)

At trial, Dr. Patricia Newhouse testified concerning the significance of the 0.13% blood alcohol reading. She testified that the peak level of absorption of alcohol into the bloodstream occurs approximately one to one and one-half hours after consumption and that alcohol leaves the bloodstream at a fairly constant rate of 0.015 percent per hour.[3] The rate of absorption,

---

1. I.C. 9–11–2–4 (Burns Code Ed.Supp.1986) provides:

   "A person who violates section 1 [operation of a vehicle with a blood alcohol content of 0.10%] or section 2 [operation of a vehicle while intoxicated] of this chapter commits a class D felony if the crime results in serious bodily injury to another person."

2. I.C. 9–11–2–5 (Burns Code Ed.Supp.1986) provides:

   "A person who violates section 1 or section 2 of this chapter commits a class C felony if the crime results in the death of another person...."

3. Dr. Newhouse's testimony on the linear rate of alcohol elimination was apparently a reference to "Widmark's Beta Factor." Widmark's studies on alcohol suggested that the rate of elimination is not affected by the amount of alcohol consumed. "If this in fact the case, then the beta factor represents the maximal capacity of body enzymes to metabolize alcohol. The amounts of alcohol normally consumed overwhelm or saturate the enzymes so that 0.015% per hour is the

and to a much lesser extent dispersion, is subject to variance on the basis of weight, age, prior food consumption, and chronic alcohol intake. Based upon these figures, Dr. Newhouse testified, a 0.13% reading three and one-half hours after the incident would mean a blood alcohol content of 0.18% at the time of the incident if the subject were eliminating alcohol throughout the entire period. On cross-examination, Dr. Newhouse testified that if peak absorption were reached during the three and one-half hour period, the extrapolation, or relation back, of the test results to the time of the incident would be more difficult. She did note, however, that even if the peak absorption rate were reached during the period, the minimum blood alcohol reading at the beginning of the time frame (at the time of the accident) would be 0.12%.[4]

The test results were the subject of Tyner's timely objection and are the sole basis for the appeal.

At the outset, we note that the test results were logically relevant. The standard for judging relevancy here, as well as in other situations, is as follows:

"Generally, evidence is admissible in criminal proceedings if it is relevant to the issue being tried. Relevancy is the logical tendency of evidence to prove a material fact. Evidence tending to prove a material fact is admissible even though its tendency to so prove the material fact may be slight." *Smith v. State* (1986) 2d Dist.Ind.App., 502 N.E.2d 122 (citations omitted).

Tyner was charged with causing death (count I) and serious bodily injury (count II) while driving while intoxicated. By statutory definition, "intoxicated" means, in part, "[U]nder the influence of alcohol ... such that there is an impaired condition of thought and action and the loss of normal control of a person's faculties to such an extent as to endanger any person." I.C. 9–11–1–5 (Burns Code Ed.Supp.1986). The State, to show the intoxication element, was required to show that there had been a consumption of alcohol, which caused an impairment. The evidence of Tyner's blood alcohol content three and one-half hours after the incident tended to show that there had indeed been an ingestion of alcohol. Thus the evidence was relevant to show a material fact, ingestion, although it was not proof *per se* of the ultimate fact, an ingestion causing impairment. *See Smith, supra* at 126–27.[5] Under these modest standards, the evidence was relevant.

By the same token, the testimony concerning the extrapolation, or relation back, of the test results to the blood alcohol content at the time of the accident was relevant. This testimony tended to show that alcohol was in Tyner's system at the time of the accident. On this question, the ultimate factual determination was whether Tyner had "operate[d] a vehicle *while* intoxicated...." I.C. 9–11–2–1 (emphasis added). Though the testimony was not dis-

---

average maximum rate of metabolism that can be attained." Nichols, *Drinking/Driving Litigation*, § 23:24. Nichols notes that since Widmark's studies were published 54 years ago, the linear nature of the rate of dispersion has been the subject of controversy. *Id.*

4. As we have noted, "It would be necessary to show the blood alcohol content at the time of the offense by means of extrapolation ... in order to support a conviction under I.C. 9–11–2–1." *Smith v. State* (1986) 2d Dist.Ind.App., 502 N.E.2d 122 at note 4. As the Supreme Court of Vermont correctly noted:

"Yet, to fulfill its burden of proof the prosecution must do more than offer the requisite chemical test. The state must also establish that the .10% level existed at the time of operation. In this case, it was incumbent upon the prosecution to relate back the .24% reading from 9:14 P.M. (last time of operation)." *State v. Rollins* (1982) 141 Vt. 105, 110, 444 A.2d 884, 886.

5. As *Smith* makes clear, one must distinguish between logical relevancy, the tendency to prove, and sufficiency, the requisite quantum of proof. This case, as well as *Smith*, provides an approach to the relevancy problem of blood alcohol tests in intoxication cases, but does not purport to modify the sufficiency question which was appropriately decided in *Warner v. State* (1986) 2d Dist.Ind.App., 497 N.E.2d 259, and *Sering v. State* (1986) 2d Dist.Ind.App., 488 N.E.2d 369. *See Smith, supra* at 126–27.

positive upon the question of whether Tyner was intoxicated,[6] it did bear upon the question of whether he was intoxicated while operating the vehicle. *Cf. State v. Bence* (1981) 29 Wash.App. 223, 627 P.2d 1343.[7] Again, the evidence was probative as to a material fact, the temporal connection between ingestion and accident, while not proof *per se* of the ultimate fact, "while intoxicated."

Tyner's specific objection to the test results is based upon the following statutory provision:

"A law enforcement officer who has probable cause to believe that a person has committed an offense under this article shall offer the person the opportunity to submit to a chemical test. It is not necessary for the law enforcement officer to offer a chemical test to an unconscious person. A law enforcement officer may offer a person more than one (1) chemical test under this chapter. However, all tests must be administered within three (3) hours after the officer had probable cause to believe the person committed an offense under IC 9–11–2. A person must submit to each chemical test offered by a law enforcement officer in order to comply with the implied consent provisions of this chapter." I.C. 9–11–4–2 (Burns Code Ed.Supp.1986).

Tyner's argument is that the fourth sentence, beginning with, "However, all tests must be administered within three (3)

hours...." creates a rule of exclusion for all test results obtained outside the three-hour time frame. The State argues that the three-hour limit should be read in context, and limited to the subject of the section: implied consent. The three hour period represents, the State argues, a time limitation after which one cannot be held responsible[8] for refusing to submit to a test procedure.

The phrasing may, on its face, appear unambiguous and therefore beyond the realm of interpretive construction. The sentence does state unequivocally a rule that all tests must be administered within three hours. The statute is silent, however, as to how that rule is to be effectuated. There is no legislative directive on that point. The sentence must therefore be analyzed and construed to determine if an exclusionary-type rule, for which Tyner argues, is supportable. It is not.

■ Of course, the basic premise of statutory construction is legislative intent. To glean legislative intent, particularly in a void of legislative history,[9] courts rely upon well-known principles of statutory construction. That methodology leads us to the conclusion that the three-hour rule is, as the State contends, designed to be a limitation upon implied consent liability.

The Legislature chose to speak to the prerequisites for and admissibility of test results in two specific sections. Indiana

6. *See* note 5, *supra.*

7. In *Bence,* the court stated that a breathalyzer reading one hour after operation of the vehicle may be considered as circumstantial evidence, and therefore relevant, of blood alcohol content *at the time* of the incident. In Washington at that time, a blood alcohol content was not an element of the crime, but was a factor which gave rise to a statutory presumption of intoxication. Wash.Rev.Code § 46.61.506 (1976). Thus the *Bence* court could, under that statutory scheme, make further use of the evidence in deciding its relevancy than can we under the current statute in Indiana.

8. Indiana Code 9–11–4–9(a) provides that the Bureau of Motor Vehicles must suspend the driving privileges of a person who refuses to consent to a test for a period of one year, or

until a termination of a suspension, which was caused by a violation of I.C. 9–11–2, occurs. Under I.C. 9–11–2–1 and I.C. 9–11–3–3 (Burns Code Ed.Supp.1986) a sentencing court must recommend to the Bureau a suspension of ninety days to two years for a misdemeanor violation of I.C. 9–11–2, and recommend a suspension of between one and two years for a felony violation of I.C. 9–11–2.

9. Indiana Code 9–11–4–2 was enacted as a part of Public Law 143–1983. The Senate Committee studying the bill made no substantial changes in it. Journal of Senate (1983) p. 1095. The House Committee, however, made substantial changes in the bill in its recommendation, Journal of House (1983) p. 551, which ultimately were adopted. None apparently affected the provision for the three-hour time limit in the implied consent section.

Code 9–11–4–15 (Burns Code Ed.Supp.1986) provides:

"At any proceeding concerning an offense under IC 9–11–2, evidence of the amount by weight of alcohol that was in the blood of the person charged with the offense at the time of the alleged violation, as shown by an analysis of his breath, blood, urine, or other bodily substance, is admissible."

As to admissibility, the Legislature provided:

"(d) Results of chemical tests that involve an analysis of a person's breath are not admissible in a proceeding under this article if: (1) The test operator; (2) The test equipment; (3) The chemicals used in the test, if any; or (4) The techniques used in the test; have not been approved in accordance with the rules adopted under subsection (a). I.C. 9–11–4–5(d) (Burns Code Ed.Supp.1986)."

This section speaks to those elements which are considered of prime importance in determining the reliability of the results of the analysis: the operator, the equipment, the chemicals and the techniques. In subsection (a), as referred to in (d), the Legislature delegated to the Department of Toxicology the rulemaking authority to specify standards for training and certification. Neither the section nor the rules promulgated under it address the outer time limit for the giving of a test.[10]

Thus the Legislature has chosen to address, with specificity, those elements which it deems crucial to admissibility. These sections confront squarely the question of evidence to be admitted in judicial proceedings. On the other hand, I.C. 9–11–4–2 speaks generally about testing as it relates to implied consent. The specific directives of the legislative enactment must be given effect if possible, and those specific directives may give dimension and restriction to more generalized provisions. *Cf., Hoage v. State* (1985) 2d Dist.Ind.App., 479 N.E.2d 1362, 1364 ("A general rule of statutory construction requires that courts implement the specific provisions of statutes over those of a more general nature.")

Moreover, the principle that statutes must not be viewed out of context, *e.g. Edward Rose of Indiana v. Fountain* (1982) 2d Dist.Ind.App., 431 N.E.2d 543, 545, compels the same conclusion. Indiana Code 9–11–4–1 (Burns Code Ed.Supp.1986) is the implied consent provision. The section in question, immediately following it, I.C. 9–11–4–2, contains five sentences. The first and second sentences state that law enforcement officers must give conscious individuals the opportunity to test. The third and fourth sentences, read together, provide that more than one test may be offered but that all tests must be administered within three hours. The fifth sentence, the lynchpin of the section, states that individuals must consent to the test to comply with the requirements of the chapter. From this, the framework of the section becomes clearer. The section as a whole details the obligations of law enforcement officers: they must offer the test, but only to those who are conscious; they may offer it more than once, but must do so within three hours. The section also details the obligation of the person detained: he must consent to the offered test. A fair reading of this section is that when law enforcement officers comply with the provisions of the section, individuals must do so as well. The three hour time limitation in the section therefore appears to be a limitation upon the liability for failing to consent to a test.

**10.** 260 I.A.C. §§ 1.1–4–1(1) (Breathalyzer), –2(1) (Intoximeter 3000), –3(1) (Intoxilyzer), –4(1) (Intoxilyzer 5000), and –5(1) (B.A.C. Verifier), *as amended by* 9 Ind.Reg. 1292 (March 1, 1986) provide in relevant part: "The person to be tested must have had nothing to eat or drink, must not have put any foreign substance in his/her mouth or respiratory tract, and must not smoke within twenty (20) minutes prior to the time a breath sample is taken." The techniques approved under the section do not address the outer time limit for a test. They only address the time after which the test may begin. The gloss upon "techniques" which Tyner would have us create is untenable. The "techniques" to which the statute refers are those which the Department of Toxicology has promulgated, not to other statutory provisions. The only time limit imposed by the Department's regulations is the twenty minute wait.

It should also be noted that this interpretation is harmonious with the chapter as a whole because it gives full effect to each provision in question. The three-hour limit retains its viability as a limit on implied consent liability and the evidentiary sections retain their vitality as a carefully prescribed and appropriately limited legislative judgment upon evidentiary matters. This internally consistent result is also a goal of statutory construction. *Cf. Foremost Life Ins. Co. v. Dept. of Ins.* (1980) 274 Ind. 181, 182, 186, 409 N.E.2d 1092, 1096. ("If possible, effect and meaning must be given to every word, and no part of a statute is to be held meaningless if that part can be reconciled with the rest of the statute.")

In light of the foregoing, it is our conclusion that three hours is, in terms of the admissibility of a chemical test, not a magic time period. Test results which are taken within the three-hour period are not automatically admissible; nor are test results taken after three hours automatically inadmissible. The full scope of common law and other statutory objections remain available to a party seeking exclusion of chemical tests. For instance, a party may seek to exclude the evidence based upon its legal relevancy, arguing that the results are too remote to assist the jury in its decisional process. That attempt, when coupled with argument as to the potentially prejudicial impact of the evidence, especially in the context of a charge of intoxication, might result in the trial court's proper exercise of its discretion to exclude the evidence.

Of course, a party is not limited to merely an objection to the test results. Failing exclusion, one may still controvert the meaning of the test results and their applicability to a particular case by other methods.

"'Additional expert testimony, while available to the defendant, is not the only method of impeaching the reading on the Breathalyzer. The State's expert testimony may be controverted by the defendant testifying about the number of drinks he consumed and the effects of the alcohol upon him, he may call lay witnesses to testify as to those same factors, he may argue that the machine must be in error because of the slight effect the alcohol had upon him. It is simply not the case that the giving of the breath sample proves the crime.'" *People v. Mertz* (1986) 68 N.Y.2d 136, 146, 497 N.E.2d 657, 662, 506 N.Y.S.2d 290, 295, *quoting State v. Franco* (1982) 96 Wash.2d 816, 828, 639 P.2d 1320, 1326.

At minimum, strong advocacy to the trier of fact concerning the weight to be attached to the results of the chemical analysis is appropriate, *Cf. Doyle v. State* (1981) Alaska App., 633 P.2d 306, 311 (whether defendant had consumed alcohol after accident but before test was, "... up to the jury to decide the weight to be given to that evidence."), particularly when the reliability of the extrapolation in a 0.10% offense is at issue.

The trial court did not err in admitting the results of the blood alcohol test.

The judgment is affirmed.

SHIELDS, P.J. and BUCHANAN, J., concur.